IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | |
|---|---|
| LONNIE KADE WELSH, <br> Institutional ID No. 6516607, <br><br> Plaintiff, <br><br> v. <br><br> STEPHEN THORNE, <br><br> Defendant. | § <br> § <br> § <br> § <br> §    CIVIL ACTION NO. 5:21-CV-156-BQ <br> § <br> § <br> § <br> § <br> § <br> § |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Proceeding pro se and *in forma pauperis*, Lonnie Kade Welsh filed this action under 42 U.S.C. § 1983, alleging violations of his constitutional rights in connection with the civil commitment review process. Welsh seeks monetary damages for his alleged injuries. Compl. 14, ECF No. 1.[1]

On October 25, 2021, the United States District Judge transferred this case to the undersigned United States Magistrate Judge to conduct preliminary screening. ECF No. 9. The undersigned thereafter reviewed Welsh's Complaint, as well as authenticated records provided by the Texas Civil Commitment Center (TCCC) and the Texas Civil Commitment Office (TCCO), and ordered Welsh to complete a questionnaire pursuant to *Watson v. Ault*, 525 F.2d 886, 892–93 (5th Cir. 1976). ECF No. 15. Welsh timely completed and returned the questionnaire. ECF No. 17.

---

[1] Page citations to Welsh's pleadings refer to the electronic page number assigned by the Court's electronic filing system.

Not all parties have consented to proceed before the undersigned magistrate judge. In accordance with the order of transfer, the undersigned makes the following findings, conclusions, and recommendations to the United States District Judge.

## I. Standard of Review

Welsh was tried and civilly adjudged to be a sexually violent predator (SVP), as provided by Texas Health & Safety Code §§ 841.061 and 841.062. Upon his release from the Texas Department of Criminal Justice (TDCJ) after completing his criminal sentence, the State of Texas transferred Welsh to the Bill Clayton Detention Center in Littlefield, Texas,[2] where he remains confined for inpatient treatment in accordance with the provisions of Texas Health & Safety Code § 841.081.

When Welsh initiated this § 1983 action, however, he was detained at the Lamb County Jail. Compl. 1, 15, 81; ECF Nos. 7, 8, 13. Therefore, the Prison Litigation Reform Act's (PLRA) *in forma pauperis* protocols apply to Welsh, and the Court has screened Welsh's Complaint under the PLRA, as well as §§ 1915 and 1915A. *See* ECF Nos. 8, 13.[3]

A court must dismiss a complaint filed *in forma pauperis* by a prisoner against a government entity or employee if the court determines that the complaint is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B) (2017); *see also* § 1915A(b) (applying section to any suit by a prisoner against certain governmental entities, regardless of whether the prisoner is proceeding *in forma pauperis*). A frivolous complaint lacks any arguable basis, either in fact or in law, for the wrong alleged. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). A

---

[2] The Bill Clayton Detention Center is also known as the TCCC.

[3] Welsh filed a motion asking the Court to reconsider application of the PLRA because Welsh's claims do "not involve a prison condition." ECF No. 12. The Court denied his motion, explaining that Welsh did not dispute he was a prisoner at the time he filed this case; therefore, the PLRA applied. ECF No. 13.

complaint has no arguable basis in fact if it rests upon clearly fanciful or baseless factual contentions, and similarly lacks an arguable basis in law if it embraces indisputably meritless legal theories. *See id.* at 327; *Geiger v. Jowers*, 404 F.3d 371, 373 (5th Cir. 2005). When analyzing a prisoner's complaint, the court may consider reliable evidence such as the plaintiff's allegations, responses to a questionnaire, and authenticated prison records. *See Wilson v. Barrientos*, 926 F.2d 480, 483–84 (5th Cir. 1991); *see also Berry v. Brady*, 192 F.3d 504, 507 (5th Cir. 1999) (explaining that responses to a questionnaire or testimony given during an evidentiary hearing are incorporated into the plaintiff's pleadings); *Banuelos v. McFarland*, 41 F.3d 232, 234 (5th Cir. 1995) (holding that courts may dismiss prisoners' *in forma pauperis* claims as frivolous based on "medical and other prison records if they are adequately identified or authenticated" (internal quotation marks omitted)).

In evaluating the sufficiency of a complaint, courts accept well-pleaded factual allegations as true, but do not credit conclusory allegations or assertions that merely restate the legal elements of a claim. *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 469 (5th Cir. 2016). And while courts hold pro se plaintiffs to a more lenient standard than lawyers when analyzing complaints, such plaintiffs must nevertheless plead factual allegations that raise the right to relief above a speculative level. *Id.* (citing *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002)).

## II. Discussion

### A. Background

Under Texas law, an SVP remains civilly committed for an indeterminate term, "until the person's behavioral abnormality has changed to the extent that the person is no longer likely to engage in a predatory act of sexual violence." Tex. Health & Safety Code Ann. § 841.081(a). Chapter 841 does provide, however, that a civilly-committed person "shall receive a biennial

examination" and "biennial review." §§ 841.101(a), 841.102; *see generally* §§ 841.101–.03 (setting out the biennial review procedures); *In re Black*, 594 S.W.3d 590, 591–92 (Tex. App.—San Antonio 2019, no pet.) (describing the biennial review process). The TCCO "contract[s] for an expert to perform the [biennial] examination." § 841.101(a). "In preparation for [the biennial review] conducted under Section 841.102" by the state court, the TCCO must provide a copy of the biennial examination report to the state judge and the SVP. *Id.* § 841.101(b). "The report must include consideration of whether to modify a requirement imposed on the [SVP] under . . . chapter [841] and whether to release the [SVP] from all requirements imposed on the [SVP] . . . ." *Id.*

Thereafter, the state court "conduct[s] a biennial review of the status of the committed person and issue[s] an order concluding the review or set[s] a hearing under Subsection (c)." § 841.102(a). Under subsection (c), the state court must set a hearing if, at the biennial review, the judge determines either "that: (1) a requirement imposed on the [SVP] under . . . chapter [841] should be modified; or (2) probable cause exists to believe that the [SVP's] behavioral abnormality has changed to the extent that the person is no longer likely to engage in a predatory act of sexual violence." *Id.* § 841.102(c).

### B. Welsh's Claims

Welsh asserts three claims against a single Defendant, Stephen Thorne, Ph.D., alleging violations of his Fourth and Fourteenth Amendment rights. *See* Compl. 1, 13 (asserting "unreasonable seizure of Welsh" and substantive due process violations). Welsh bases his claims on Dr. Thorne's biennial examination (conducted in August 2019) and his corresponding report submitted on January 23, 2020, to the reviewing state court. *Id.* at 2 (copy of Dr. Thorne's report is attached to Welsh's Complaint—*see id.* at 17–28). Welsh alleges that Dr. Thorne "taint[ed] the" state court's § 841.102 "probable cause review" by, *inter alia*: (1) making "reckless statements to

4

accus[e] Welsh of crimes that never occurred; (2) using "hearsay on top of hearsay"; (3) failing to "report the facts in the" state court records; (4) inaccurately reporting Welsh's scores on various diagnostic tests; and (5) misdiagnosing Welsh. *Id.* at 4–10.

Specifically, Welsh asserts that Dr. Thorne improperly cited a Confidential Risk Assessment authored on October 16, 2014, by Charles P. Woodrick, Ph.D., in which Dr. Woodrick observed that in addition to the crimes for which Welsh was convicted, Welsh's daughters may also be the victims of sexual assault by Welsh. *Id.* at 3–4, 22. Welsh believes that Dr. Thorne should have verified the state court records underlying Dr. Woodrick's assertion, which would show that Child Protective Services (CPS) determined the allegations of sexual assault were unfounded. *Id.* at 4.

Further, Welsh contends that Dr. Thorne incorrectly reported Welsh's "Hare Psychopathy Checklist" score by adding a third factor that "is not found in the test." *Id.* at 4–5. Dr. Thorne's report does not reference a third factor, but the Court understands Welsh as complaining about Dr. Thorne's addition of three points to Welsh's raw score for a total of twenty-eight points. *Id.* at 18 (explaining that Welsh "obtained a Factor 1 score of '12' . . . and a Factor 2 score of '13'" for a total "raw score of '28' [which] places him in the 'High' range of psychopathic characteristics"). According to Welsh, Dr. "Thorne also refused to report that the score is a change from a Doctor McGarrahan score of 30 given at trial that placed Welsh into the threshold of psychopathic personality." *Id.* at 5. In addition, Welsh believes Dr. Thorne should have expressly informed the state court in his report that Welsh scored differently on the Hare Psychopathy Checklist and the Static-99R tests than in previous reports. *See id.* at 5–6.

Welsh also references a litany of other perceived errors by Dr. Thorne, including (1) reporting that Welsh met the requirements under the Diagnostic and Statistical Manual of

Mental Disorders (DSM-V) for pedophilia without accurate factual support, (2) diagnosing Welsh with ephebophilia, which Welsh argues "is not a generally accepted medical or scientific diagnosis," and was, in any event, totally lacking in any factual support, (3) "not indicating how Welsh has current or recurrent intense sexually arousing fantasies or urges," and (4) stating that "Welsh has a behavioral abnormality" without supporting information. *Id.* at 6–10.

Welsh avers that the state court relied on Dr. Thorne's report when it determined that "Welsh still has a behavioral abnormality," causing Welsh to remain committed for another two years.[4] *Id.* at 3, 11. Moreover, Welsh contends that Dr. "Thorne injured Welsh by causing him depression and physical and mental sickness making him have stress headaches and sleepless nights," as well as "the loss of the enjoyment of life by depriving him time with family and friends and the . . . experience of life." *Id.* at 12.

Welsh alleges that the foregoing amounted to violations of both his Fourth and Fourteenth Amendment rights (unreasonable seizure and substantive due process). *Id.* at 13. Welsh only seeks money damages for Dr. Thorne's alleged constitutional violations. *Id.* at 14.

### C. Welsh's Fourth Amendment claim is *Heck*-barred, but his substantive due process claims are not.

In *Heck v. Humphrey*, the United States Supreme Court held that a plaintiff seeking to recover damages for harm "caused by actions whose unlawfulness would render a conviction or sentence invalid" must first prove that "the conviction or sentence has been reversed on direct

---

[4] The authenticated records reflect that on October 12, 2020, Judge Patty Maginnis of the 435th Judicial District of Montgomery County, Texas, signed a "Biennial Review Order," which states:
> The Court has reviewed the file and been advised that Lonnie Kade Welsh has failed to make progress in behavior modification. Additionally, there is no evidence submitted to the Court to date to suggest that sex offender treatment of . . . Welsh has resulted in his behavioral abnormality having changed to the extent that . . . Welsh is no longer likely to engage in a predatory act of sexual violence.

Judge Maginnis therefore ordered that Welsh "remain a committed person pursuant to the Texas Health and Safety Code Chapter 841."

6

appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." 512 U.S. 477, 486–87 (1994). Where a favorable judgment in the civil rights action would "necessarily imply the invalidity of [a plaintiff's] conviction or sentence" in his criminal case, the civil claim is barred unless the criminal conviction has been reversed or otherwise declared invalid. *Id.* In addition to actions for monetary damages, courts have subsequently applied the "*Heck* bar" to prisoners' claims for injunctive and declaratory relief. *Reger v. Walker*, 312 F. App'x 624, 625 (5th Cir. 2009) (per curiam) (noting that whether a plaintiff's claims are "for damages, declaratory judgment, or injunctive relief," they are not cognizable under § 1983 until plaintiff's conviction is overturned or otherwise declared invalid).

"Determining whether a particular claim is barred by *Heck* is 'analytical and fact-intensive' and requires the court to consider the specifics of the individual claim." *Smith v. Hood*, 900 F.3d 180, 185 (5th Cir. 2018) (quoting *Bush v. Strain*, 513 F.3d 492, 497 (5th Cir. 2008)). This analysis examines whether a plaintiff's "claims are 'necessarily inconsistent' with the conviction, or whether they can 'coexist' with the conviction or sentence without 'calling [it] into question.'" *Id.* (quoting *Ballard v. Burton*, 444 F.3d 391, 400–01 (5th Cir. 2006)) (alteration in original). Thus, where a plaintiff challenges the conditions of his confinement—"but not the fact or length of the sentence"—his claim is not *Heck*-barred. *Id.*

The Fifth Circuit has not expressly extended the *Heck* doctrine "to the civil commitment context." *Id.*; *see Dunsmore v. Kenyon*, No. 3:21-cv-544-X-BN, 2021 WL 1601768, at *2 (N.D. Tex. Mar. 11, 2021) (acknowledging that the Fifth Circuit has not applied *Heck* to a civil commitment determination, but opining that *Heck*'s favorable determination rule, which applies to criminal convictions, "appears equally applicable to bar civil claims based on 'factual

allegations [that] are necessarily inconsistent with the validity of [a civil commitment order]' that the plaintiff fails to show has been reversed on direct appeal or otherwise declared invalid" (alterations in original) (quoting *McCann v. Neilsen*, 466 F.3d 619, 621 (7th Cir. 2006))). Other circuits have, however, applied *Heck* to claims raised by civilly-committed plaintiffs, where the claims are inconsistent with valid civil commitments and challenge the length or fact of confinement. *See, e.g., Henderson v. Bryant*, 606 F. App'x 301, 304 (7th Cir. 2015); *Turner v. Johnson*, No. 11–7504, 2012 WL 560233, at *1 (4th Cir. Feb. 22, 2012) (per curiam); *Huftile v. Miccio-Fonseca*, 410 F.3d 1136, 1139–40 (9th Cir. 2005). For the reasons set forth below, *Heck* does not operate as a bar to Welsh's substantive due process claims but does preclude any cause of action based on illegal or improper seizure under the Fourth Amendment.

   *1. Substantive due process claims*

   Here, Welsh contends that Dr. Thorne's biennial examination report contained false or incorrect information in violation of his substantive due process rights. *See* Compl. 2–11; Questionnaire 6, ECF No. 17. Welsh alleges that Dr. Thorne's report was "the sole issue on review in the determination if Welsh should remain civilly committed," and the false report "tainted" the state court's biennial review. Compl. 2, 12.

   A finding in this action that Dr. Thorne's report violated Welsh's substantive due process rights would not necessarily require his release from civil commitment—despite Welsh's allegation that Dr. Thorne's report is the only evidence the state court considered in the biennial review process. In reaching this conclusion, the Court draws on the structure of the biennial review process as set forth in § 841.102. Under the statute, "the judge shall conduct a biennial review of the status of the committed person and issue an order concluding the review or setting a hearing under Subsection (c)." § 841.102(a). "The judge shall set a hearing if the judge determines at the

biennial review that" either (1) a requirement of the SVP's commitment should be modified, or (2) "probable cause exists to believe that the" SVP's "behavioral abnormality has changed" such that the person should no longer remain committed. *Id.* § 841.102(c).

According to Welsh, Dr. Thorne's report was "the sole issue on review in the determination if Welsh should remain civilly committed." Compl. 2. Even accepting this allegation as true, under the applicable statutory scheme Welsh, at best, might have been entitled to another hearing, but he would not have been granted immediate, or even accelerated, release. *See* § 841.102(a), (c); *see also* § 841.103 (providing that if the judge sets a hearing under § 841.102(c), the SVP "is entitled . . . to have the benefit of all constitutional protections provided to the person at the initial civil commitment proceeding"). This remains true even if the state court should have disregarded the challenged portions of Dr. Thorne's report, i.e., the "sole" evidence (according to Welsh) that he should remain confined. The report nevertheless contains additional information (*see* Compl. 2–11) upon which the court could rely or, even if the report lacked any other basis in support, the state court's statutory options remained the same—it either had to "conclude the review" or set a hearing to determine whether Welsh's "behavioral abnormality has changed to the extent that the person is no longer likely to engage in a predatory act of sexual violence," neither of which would have led to his release. § 841.102(c)(2). Under any scenario, Welsh's claim does not undermine the validity of his commitment. *See Heck*, 512 U.S. at 487 n.7.

The undersigned also finds instructive the reasoning in *Wilkinson v. Dotson*, 544 U.S. 74 (2005), which discusses the parole review process, in concluding that Welsh's claims are not *Heck*-barred. In *Wilkinson*, "[t]wo state prisoners brought an action under 42 U.S.C. § 1983 claiming that Ohio's state parole procedures violate[d] the Federal Constitution." *Id.* at 76. Through their suit, the prisoners sought declaratory and injunctive relief, asking for new parole hearings

9

conducted under the correct procedures. *Id.* at 76–77. The district court concluded that the prisoners could not assert their claims under § 1983 but would instead have to seek relief through habeas petitions. *Id.* at 77. The court of appeals reversed, concluding the prisoners "could proceed under § 1983." *Id.* The Supreme Court agreed, explaining that its cases have indicated the following:

> [T]hat a state prisoner's § 1983 action is [*Heck*] barred (absent prior invalidation)—no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings)—*if* success in that action would necessarily demonstrate the invalidity of confinement or its duration.

*Id.* at 81–82. While the prisoners' challenges would "render invalid the state procedures used to deny parole eligibility . . . and parole suitability" (*id.* at 82), their success on the § 1983 claims would not "mean immediate release from confinement or a shorter stay in prison." *Id.* At most, it meant "new eligibility review" or "a new parole hearing," at which time officials could similarly decline to deny parole. *Id.* In sum, "neither prisoner's claim . . . necessarily spell[ed] speedier release," and therefore did not lie "at 'the core of habeas corpus.'" *Id.* (citation omitted).

Like the plaintiffs in *Wilkinson*, Welsh does not ask for release from commitment—accelerated or complete. *See* Compl. 2–14. Instead, he asks for monetary damages in connection with Dr. Thorne's alleged violations. *Id.* at 14. Under the relevant statutory provisions, "[s]uccess for [Welsh] means at most a new [biennial review examination]," after which the state court judge "may, in [her] discretion, decline to" find probable cause or may otherwise hold a hearing. *Wilkinson*, 544 U.S. at 82; *see* § 841.102. "Because [Welsh's] . . . [substantive due process] claim[s] would [not] necessarily spell speedier release," it does not lie at "the core of habeas corpus." *Wilkinson*, 544 U.S. at 82 (citation omitted).

10

For these reasons, the undersigned concludes Welsh's substantive due process claims are not *Heck*-barred.[5]

*2. Unreasonable Seizure under the Fourth Amendment*

Conversely, the Court finds that Welsh's Fourth Amendment unreasonable-seizure claim is barred by *Heck*. Rather than challenging the review process itself and the impact of Dr. Thorne's alleged false/incorrect testimony on that procedure, as in Welsh's due process claim, here Welsh simply and directly asserts that Dr. Thorne's claimed unconstitutional conduct resulted in Welsh's "unreasonable seizure," i.e., his continued detention. *See* Compl. 2–3, 11. According to Welsh, but for the false and incorrect information contained in Dr. Thorne's report, he would have been released from civil commitment. *See* Questionnaire 1 (agreeing that but for Dr. Thorne's report, Welsh would have been released from civil commitment); Compl. 12 (alleging that Dr. "Thorne caused Welsh the loss of the enjoyment of life by depriving him time with family and friends"), 12–13 (contending that Dr. Thorne left "out relevant information for the purpose of continuing Welsh's commitment").

To state a viable § 1983 claim for unreasonable seizure, a plaintiff must demonstrate that (1) he was seized within the meaning of the Fourth Amendment, and (2) that the seizure was unreasonable. *Brower v. Cnty. of Inyo*, 489 U.S. 593, 599 (1989). Although Welsh asserts that Dr. Thorne's report caused Welsh to be unreasonably seized, Welsh was already civilly committed (i.e., "seized") at the time of the biennial review. As a result, the nature of Welsh's Fourth Amendment claim is an alleged injury based on his continued confinement—not the review process or Dr. Thorne's report, standing alone. Thus, unlike his substantive due process claim,

---

[5] Of course, if the Court is incorrect in this analysis, and resolution of Welsh's due process claim would in fact undermine the validity of his commitment order, it would nevertheless be barred for the reasons set forth at pages 11–12 herein.

11

Welsh's Fourth Amendment claim is "necessarily inconsistent with" his continued commitment, and a favorable finding on Welsh's claim in this action would directly undermine the validity of his continued commitment. *See Dunsmore*, 2021 WL 1601768, at *2 (opining that *Heck*'s favorable determination rule "appears equally applicable to bar civil claims based on 'factual allegations [that] are necessarily inconsistent with the validity of [a civil commitment order]'"). Welsh must therefore demonstrate that the decision to confine him has been overturned. But Welsh has not pleaded any facts suggesting that the October 2020 biennial review, or the original judgment committing him, has been called into question through a habeas corpus petition or other challenge. *See* Questionnaire 6.[6] Accordingly, the Court finds Welsh's claim is barred by *Heck*. *See generally Walter v. Horseshoe Ent.*, 483 F. App'x 884, 887 (5th Cir. 2012) (per curiam) (concluding plaintiffs' false arrest claims were *Heck*-barred, where plaintiffs were convicted of the crimes for which they were arrested); *Allen v. Seiler*, No. 4:12–CV–414–Y, 2013 WL 357614, at *2–3 (N.D. Tex. Jan. 30, 2013) (concluding SVP's claims arising from civil commitment proceedings were not cognizable until SVP met the conditions of *Heck*). The undersigned therefore recommends dismissal of Welsh's Fourth Amendment unreasonable-seizure claim until the conditions of *Heck* are met.[7]

---

[6] The Court provided Welsh the opportunity to so establish through the questionnaire. Questionnaire 6. Instead of directly answering whether he has "appealed or otherwise challenged the state court's decision, Welsh stated: "I really take offense to this question especially from you Judge Bryant." *Id.* Further, Welsh states in several places in his Complaint that biennial review orders are not "final order[s] under Texas Law." *See, e.g.*, Compl. 3. The Court agrees that Texas law seems to foreclose direct appeals of biennial review orders. *See, e.g., Black*, 594 S.W.3d at 592–93 (discussing the courts of appeals' jurisdiction over appeals and "hold[ing] the trial court's order finding no probable cause in the context of a Chapter 841 biennial review is not appealable"). The unavailability of a direct appeal, however, does not foreclose Welsh's ability to pursue other types of challenges. Indeed, Welsh apparently filed at least two mandamus petitions challenging Judge Maginnis's October 2020 biennial review order on various grounds. *In re Welsh*, No. 09-21-00179-CV, 2021 WL 3555735, at *1 (Tex. App.—Beaumont Aug. 12, 2021, no pet.) (per curiam); *In re Welsh*, No. 09-20-00251-CV, 2020 WL 7062326, at *1 (Tex. App.—Beaumont Dec. 3, 2020, no pet.) (per curiam). The court of appeals denied the petitions. *Welsh*, 2021 WL 3555735, at *1; *Welsh*, 2020 WL 7062326, at *2.

[7] Even if Welsh's Fourth Amendment claim were not *Heck*-barred, the undersigned would nevertheless recommend dismissal. The state court judge made the ultimate determination to continue Welsh's civil commitment, finding that his behavioral abnormality has not changed. Moreover, Welsh pleads no facts indicating that Dr. Thorne has any

### D. Alternatively, Welsh's claims are barred by the *Rooker-Feldman* doctrine.

Alternatively, Welsh's claims under the Fourth and Fourteenth Amendments are barred by the *Rooker-Feldman* doctrine. The Supreme Court has held that federal district courts lack subject matter jurisdiction over actions in which a plaintiff challenges a state court judgment. *See D.C. Court of Appeals v. Feldman*, 460 U.S. 462, 486 (1983) (citing 28 U.S.C. § 1257); *Rooker v. Fid. Tr. Co.*, 263 U.S. 413, 416 (1923); *see Miller v. Dunn*, 35 F.4th 1007, 1010 (5th Cir. 2022) ("The *Rooker-Feldman* doctrine generally precludes lower federal courts 'from exercising appellate jurisdiction over final state-court judgments.'" (footnote omitted) (quoting *Lance v. Dennis*, 546 U.S. 459, 463 (2006)). Known as the *Rooker-Feldman* doctrine, federal district courts cannot "hear 'cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.'" *Brown v. Taylor*, 677 F. App'x 924, 927 (5th Cir. 2017) (quoting *Exxon Mobil Corp. v. Saudi Basics Indus. Corp.*, 544 U.S. 280, 291 (2005)). "To determine if *Rooker-Feldman* applies, courts look to the source of the federal plaintiff's alleged injury and what the federal court is being asked to review and reject." *Id.* (citing *Truong v. Bank of Am., N.A.*, 717 F.3d 377, 381 (5th Cir. 2013)). Where a federal district court must "review and reject the state court's decision," or where the plaintiff's claims are "inextricably intertwined with a state court judgment," federal court review of the state court judgment is barred. *Id.* (internal quotations and citations omitted).

Welsh's claims are inextricably intertwined with the state court's biennial review order. In essence, Welsh contends that the state court relied on Dr. Thorne's unlawful report in committing

---

involvement in the actual housing or physical commitment of Welsh. *See* Compl. 2–13. Thus, to the extent Welsh faults Dr. Thorne for singlehandedly extending his commitment, Welsh blames the wrong defendant. *See Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983) ("Personal involvement is an essential element of a civil rights cause of action.").

Welsh for another two years. Thus, this Court must necessarily "review and reject" the state court order continuing Welsh's commitment (i.e., the source of the injury) to properly determine Welsh's claims. *See Brown*, 677 F. App'x at 927.

The Court acknowledges that *Rooker-Feldman* is a narrow doctrine. *See, e.g., id.* (noting that the Supreme Court has found jurisdiction precluded by *Rooker-Feldman* only twice). In *Brown v. Taylor*, for example, the Fifth Circuit reversed the district court, and concluded that an SVP's claims were not barred by *Rooker-Feldman* because the claims challenged Defendants' specific actions and the legislative basis for such conduct—not the underlying state civil commitment order. *Id.* at 927–29. Unlike in *Brown*, however, the source of Welsh's claimed injury is the state court biennial review order. *In re Smith*, 349 F. App'x 12, 15 (6th Cir. 2009). Although Welsh complains of Dr. Thorne's actions, the gravamen of Welsh's claims directly challenge the biennial review order and require its review—something this Court cannot do. *See, e.g., Handsaker v. Tex. Civ. Commitment Ctr.*, No. 5:19-CV-200-BQ, 2020 WL 3052751, at *4 (N.D. Tex. May 12, 2020) (concluding SVP's claim that he was confined against his will at the TCCC was barred by *Rooker-Feldman* doctrine), *R. & R. adopted by* 2020 WL 3052225 (N.D. Tex. June 8, 2020); *Black v. Turner*, No. 5:17-CV-111-C, slip. op. at 4–6 (N.D. Tex. Sept. 7, 2017) (concluding SVP's claim that he was civilly committed based on allegedly false information in an expert witness report was barred by the *Rooker-Feldman* doctrine). The fact that Welsh may not be able to directly appeal the biennial review order (*see supra* note 6) does not alter this conclusion, as the biennial review order is essentially final for review purposes. *Cf. Miller*, 35 F.4th at 1008 (holding "that *Rooker-Feldman* does not apply to the situation where a state case is pending on appeal when the federal suit is filed").

### E. Welsh has failed to plead facts stating a viable substantive due process claim.

To the extent Welsh's substantive due process claims are not barred by *Heck* and the *Rooker-Feldman* doctrine, the Court concludes he has failed to state a viable claim sufficient to survive screening. As a civilly committed person, Welsh is entitled to "more considerate treatment and conditions of confinement" than a prison inmate. *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982). Because Welsh "has been civilly committed to state custody as a [sexually violent predator]," however, "his liberty interests are considerably less than those held by members of free society." *Senty-Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006) (citing *Wilkinson v. Austin*, 545 U.S. 209, 224–26 (2005) and *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)); *see Kansas v. Hendricks*, 521 U.S. 346, 368 n.4 (1997) (stating that officials "enjoy wide latitude in developing treatment regimens [for SVPs]"); *Brown v. Taylor*, 911 F.3d 235, 243 (5th Cir. 2018) (per curiam) (noting that "the Constitution . . . affords a state wide latitude in crafting a civil commitment scheme" because "the state legislatures not only are equipped, but also possess the democratic mandate, to make difficult policy choices regarding the supervision and treatment of sexually violent predators" (citations omitted)).

"[T]he substantive component of the Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'" *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998) (internal quotation marks and citation omitted). "[W]hat is conscience shocking" is not measured by a "calibrated yard stick." *Id.* Instead, "[d]ue process requires only that 'the conditions and duration of confinement . . . bear some reasonable relation to the purpose for which persons are committed.'" *Brown*, 911 F.3d at 243 (quoting *Seling v. Young*, 531 U.S. 250, 265 (2001)). As the Fifth Circuit observed in *Brown*

*v. Taylor*, Texas maintains "twin goals of 'long-term supervision and treatment of sexually violent predators.'" *Id.* (quoting § 841.001).

At the outset, the Court notes that although Welsh attributes his continued (or prolonged) civil commitment to the alleged false report written by Dr. Thorne, a state court judge—not the retained expert—determines whether Welsh's "behavioral abnormality has changed to the extent that [he] is no longer likely to engage in a predatory act of sexual violence." §§ 841.081(a), 841.102. Dr. Thorne performed the examination, prepared a report, and made a recommendation on Welsh's status (*id.* § 841.101), which the state court judge then reviewed and issued an order continuing Welsh's commitment. *Id.* § 841.102(a). Stated differently, the state court judge made the ultimate determination to continue Welsh's civil commitment, finding that his behavioral abnormality has not changed to the extent he should be released. Thus, Welsh's contention that Dr. Thorne is responsible for extending his commitment is misplaced.

Further, Welsh's contention that he would have been released from commitment but for Dr. Thorne's alleged false report is theoretical at best. Welsh pleads no facts demonstrating that he was otherwise eligible for advancement in tiers or release, or would have in fact received such a promotion or been released to less restrictive housing, absent the report. *See* Questionnaire 1 (stating that Dr. Thorne's report was "the only offer of probable cause that would substantiate the purpose to continue confinement" but pleading no facts in support of that conclusory statement), 8 (refusing to respond to the Court's question asking Welsh to confirm that at the time of Dr. Thorne's report, Welsh was classified as a Tier 1 resident, the most-restrictive level on a five-tier scale); Compl. 26–27 (reporting that Welsh was a Tier 1 resident at the time of the report). On this basis, Welsh's claim must also be dismissed. *See generally DeMarco v. Davis*, 914 F.3d 383, 386–87 (5th Cir. 2019) ("We do not accept as true conclusory allegations, unwarranted factual

16

inferences, or legal conclusions." (quoting *Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010))); *Senty-Haugen*, 462 F.3d at 887 (analyzing SVP's procedural due process claim and noting that because there was no basis for determining "at what point he might be released from the Offender Program, regardless of whether he had treatment throughout his isolation period," the possibility of lengthened commitment was too attenuated to require further due process protections).

Finally, even considering the substance of Welsh's due process claims, he fails to allege facts demonstrating a constitutional violation. Welsh contends that the purported errors in Dr. Thorne's report violated his substantive due process rights in the following ways: denied his "right to liberty [free from] arbitrary and capricious measures" and "deliberately diagnos[ed] Welsh wrongly either with Pedophila [sic], Ephebophilia and/or the Behavioral Abnormality." Compl. 13. In support, Welsh picks out a variety of perceived "analytical gaps" and "lies" in Dr. Thorne's report. Questionnaire 5. For example, Welsh argues that Dr. Thorne should not have reported that state records indicate Welsh may have sexually abused his children because a CPS investigation determined the allegations were unfounded. *See* Compl. 4; Questionnaire 2–3. But the report only references that Welsh's children are "[p]ossible additional victims" and that Welsh's criminal history may not fully reflect the extent of his "sexually deviant behavior"—an additional consideration of the "risk factors relevant to [Dr. Thorne's] evaluation." Compl. 22. Welsh additionally challenges the diagnoses Dr. Thorne made (including those for pedophilia and ephebophilia), contending that he does not meet the criteria for either and that ephebophilia is not a scientifically-recognized disorder. *Id.* at 6–9; Questionnaire 2–4.

Welsh also points to a purported error in Dr. Thorne's Hare Psychopathy Checklist score, alleging that Dr. Thorne added a third factor that does not exist in the test to arrive at a raw score

17

of "28." Compl. 4–5, 18. And Welsh believes that Dr. Thorne should have advised the state court that he had scored Welsh differently than in previous examinations. *Id.* at 5–6.

The Court cannot say that the foregoing alleged errors in Dr. Thorne's report amount to behavior "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Lewis*, 523 U.S. at 847 n.8. The majority of Welsh's complaints concerning Dr. Thorne's report attack Dr. Thorne's professional opinion or diagnosis, or the methodology by which Dr. Thorne arrived at his recommendation. Such decisions are "presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg*, 457 U.S. at 323. Welsh has not pleaded facts showing that Dr. Thorne's recommendation that Welsh continues to possess a behavioral abnormality does not "bear some reasonable relation to the purpose for which [he] [is] committed." *Brown*, 911 F.3d at 243.

Welsh's allegation of fraud likewise fails to demonstrate conscious-shocking behavior. *See* Compl. 10. Welsh provides no factual support for his bald allegation, despite the Court's opportunity for him to do so. Questionnaire 4 (asserting that Dr. Thorne's ostensible mistakes are "tantamount to intent [because] [p]eople naturally intend the result of their actions" but failing to plead any facts from which the Court could conclude Dr. Thorne acts, if deceptive or incorrect, were intentional).

This conclusion is bolstered by the fact that Dr. Thorne's report reflects that his recommendation was not based solely on the alleged errors. Dr. Thorne expressly stated that in evaluating whether Welsh continues to meet the criteria of having a behavioral abnormality, he considered the following:

> An interview with Mr. Welsh, a review of the available collateral data, phone conversations with Mr. Welsh's current TCCO sex offender treatment provider and with his current TCCO Case Manager, [Dr. Thorne's] own observations, and results from the current psychological and actuarial testing . . . .

Compl. 20. Dr. Thorne's report reflects, for example, that he reviewed the criminal charges for which Welsh had been convicted (five separate sex offenses), and noted that "multiple sex offenses (including continued offending after punishment [which applied to Welsh]) has been shown to be one of the strongest and most consistent empirical predictors of sex recidivism." *Id.* at 21–22. In addition, Dr. Thorne observed that prior to commitment, Welsh had not been compliant while on mandatory supervision—a fact that is also "associated with increased levels of sexual recidivism." *Id.* at 24. And while Dr. Thorne reported that Welsh had been compliant with treatment and was potentially eligible for promotion, Welsh had remained a Tier 1 resident for four years. *Id.* at 26–27.

In sum, this Court "must show deference to the judgment exercised by a qualified professional." *Youngberg*, 457 U.S. at 322. Even assuming as true Welsh's contention that Dr. Thorne's report contained errors, the undersigned finds Welsh has failed to demonstrate that Dr. Thorne violated Welsh's substantive due process rights. *Id.* at 324 ("[D]ecisions made by the appropriate professional are entitled to a presumption of correctness."); *Van Orden v. Stringer*, 937 F.3d 1162, 1170 (8th Cir. 2019) (finding SVPs' allegation that annual reviewers applied incorrect standards did not shock the conscience, particularly where "the annual review[s] [were] presented to a state court that is charged with reviewing the matter independently under correct legal standards"). Dr. Thorne "should not be required to make [a biennial examination] decision in the shadow of an action for damages." *Youngberg*, 457 U.S. at 325.

For all of these reasons, the undersigned recommends that the district judge dismiss Welsh's substantive due process claims.

### III. Recommendation

Based on the foregoing, the undersigned recommends that the United States District Judge dismiss with prejudice Welsh's Complaint and all claims alleged therein, excepting Welsh's Fourth Amendment unreasonable seizure claim, which should be dismissed with prejudice until the conditions of *Heck v. Humphrey*, 512 U.S. 477 (1994) are met.

### IV. Right to Object

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1) (2016); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding, conclusion, or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's Findings, Conclusions, and Recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

Dated: June 30, 2022.

D. GORDON BRYANT, JR.
UNITED STATES MAGISTRATE JUDGE